RENDERED: NOVEMBER 21, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0669-MR

DESMOND L. SMITH                                                    APPELLANT


APPEAL FROM JEFFERSON CIRCUIT COURT
v.             HONORABLE JENNIFER WILCOX, JUDGE
ACTION NO. 19-CR-002433


COMMONWEALTH OF KENTUCKY                              APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE: EASTON, L. JONES, AND McNEILL, JUDGES.

JONES, L., JUDGE: A jury found Desmond Smith (Smith) guilty of two counts of

criminal abuse in the first degree with count one relating to second-degree

immersion burns caused when Smith held his two-year-old son (K.R.)[1] down in

scalding bath water and count two relating to a depressed skull fracture received by

K.R. while in Smith's care. Smith contends the trial court erred: (1) by denying

---

[1] To protect the privacy of the minor victim, we identify him by initials only.

his motion for a directed verdict on count two due to the failure of the Commonwealth to prove K.R. was in the actual custody of Smith at the time K.R. received the skull fracture; (2) by improperly instructing the jury by including an instruction on first-degree criminal abuse for the immersion burns when there was insufficient evidence to support a finding of intent; and (3) by denying Smith's pretrial motion to dismiss both counts for due process violations due to pre-indictment delay. Finding no error, we affirm the convictions.

## BACKGROUND

K.R. was born in November of 2014. The child primarily resided with his mother in Wisconsin, but occasionally visited with Smith. K.R. was with Smith in Jefferson County for one of these visits in June of 2017. K.R. had been with Smith for approximately two weeks on June 21, 2017. On that day, Smith returned to the apartment he shared with Deondra Ford (Ford). Ford had been watching K.R. while Smith was out. Smith and K.R. participated in a video chat with K.R.'s mother who testified that K.R. appeared normal and happy during the call. Following the call, Smith took K.R. to the bathroom where he ran bathwater.

Ford testified that she heard Smith curse and loudly exclaim that K.R. had defecated in the bathtub. She heard a loud thud and the sounds of a spanking, but did not hear any noises from the child. Smith admitted to spanking K.R., emptying the bathtub, and then refilling it before placing K.R. in the water. Smith

testified that K.R. began suffering what appeared to him to be a seizure when he poured water over the child's head. Smith removed K.R. from the water and attempted CPR.[2]

The fire department and EMS[3] arrived in response to a 911 call. The fire department placed a breathing mask on K.R. and EMS transported the child to Norton's Hospital via ambulance. While in transport to the hospital, emergency personnel noticed blisters associated with second-degree burns began appearing on the child's lower torso. Ultimately, blisters developed on K.R.'s feet, ankles, thigh, lower torso and genitals, and there was a red demarcation line on the child's body indicating the level of the water. Dr. Melissa Currie, a board-certified child-abuse pediatrician, examined the medical records of K.R. and statements given by Smith and other witnesses. Dr. Currie testified that the demarcation and degree of blistering indicated K.R. had been held down in the scalding water for several minutes. Significant bruising was also noted to K.R.'s thighs, buttocks, and jawline. At the hospital, K.R. went into shock and required life-saving intervention.

While Dr. Currie's testimony indicated most of the bruising could have occurred up to eighteen hours before K.R.'s arrival at the emergency room,

---

[2] Cardiopulmonary resuscitation.

[3] Emergency medical services.

and the skull fracture could have occurred twenty-four to forty-eight hours earlier than arrival at the emergency room, she also determined that the injuries could also have occurred as part of the same event and in conjunction with the immersion burns. In particular, Dr. Currie described the location of the bruising as indicative of inflicted rather than accidental injury. She also testified that the presence of the demarcation line of scalding to K.R.'s skin was consistent with forced immersion. Though Dr. Currie indicated the skull fracture could have been caused by a fall from a height, she also stated that such a significant head injury would have produced symptoms that were immediately apparent to a caregiver.

Smith provided three separate statements to the police. In his first statement, taken at the hospital, Smith said there were no injuries to the child's body when he placed K.R. in the tub, nor did Smith describe any head trauma, though he claimed the child was not acting like himself during the video call with his mother. When Smith was informed of K.R.'s head injury, Smith claimed the child had slipped and fallen before getting into the tub. When Smith was told of the scalding burns, he denied he had placed K.R. in hot water.

In a second statement taken on June 21, 2017, Smith described wrestling with K.R. and K.R. playing with other children in the days before K.R. was taken to the hospital. He also indicated K.R. may have been climbing on

something while playing outside. Smith also claimed K.R. had gotten into the tub of hot water on his own and was only in the water for a short time.

Smith provided a third statement on July 12, 2017, two days after K.R.'s release from the hospital. In this statement, Smith stated that he had been trying to potty-train K.R. and became upset when K.R. defecated in the bathwater. Smith admitted to spanking K.R. and redrawing the bath, though he continued to claim K.R. re-entered the bathtub on his own and remained there while Smith bathed him. Smith said nothing was odd until he poured water over K.R. and the child began shaking like a seizure. In this interview, Smith admitted the child was in the water fifteen to twenty minutes but denied the bath water was hot enough to cause burns and said K.R. never cried or screamed. Smith denied striking K.R. or causing the head injury, but later admitted the bath water might have been too hot.

Smith also testified at the trial, providing a fourth version of events. In this recounting, Smith again described K.R. as not acting like himself while on the video call. Smith described his first attempt to bathe K.R. and K.R.'s toilet accident in the tub which resulted in Smith spanking the child, cleaning out the tub, and refilling the bath. Smith admitted to placing K.R. into the tub to soak before Smith began to bathe him. Smith testified that when he poured water over K.R.'s head, the child "flipped back" and that Smith noticed something wrong with his

eyes. Smith said this prompted him to remove K.R. from the tub whereupon Smith attempted CPR until emergency services arrived on scene.

On August 28, 2017, the matter was submitted to the Commonwealth's Attorney's Office for review; however, charges were not brought against Smith until a second reported incident of abuse occurred in August of 2019. Once more, K.R. was the victim of the abuse. On September 5, 2019, Smith was indicted on three counts of first-degree criminal abuse: (1) related to the immersion burns, (2) related to the skull fracture, and (3) related to the August 2019 abuse. In 2021, Smith moved to sever count three, but the motion was never ruled upon. However, before trial the Commonwealth agreed to severance. Smith then moved for the dismissal of counts one and two due to pre-indictment delay. The trial court denied his motion.

Following a four-day trial, a jury found Smith guilty of two counts of first-degree criminal abuse and set his punishment at eight years and ten years of incarceration respectively, to run consecutively for a total punishment of eighteen-years' imprisonment. The trial court sentenced Smith in accordance with the recommendations of the jury. This appeal follows.

# ANALYSIS

1. *The trial court did not err in denying Smith's motion for directed verdict on count two of the indictment against him*.

"On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991). And as an appellate court, we must be mindful not to "invade the jury's province to weigh conflicting evidence, judge the credibility of [the] witnesses and draw the ultimate conclusion." *Beatrice Foods Co. v. Chatham*, 371 S.W.2d 17, 19 (Ky. 1963). Jurors may choose to believe or disbelieve in whole or part the testimony of any witness. *Commonwealth v. Smith*, 5 S.W.3d 126, 129 (Ky. 1999).

KRS[4] 508.100 states:

(1) A person is guilty of criminal abuse in the first degree when he intentionally abuses another person or permits another person of whom he has actual custody to be abused and thereby:

(a) Causes serious physical injury;

(b) Places him in a situation that may cause him serious physical injury; or

(c) Causes torture, cruel confinement or cruel punishment;

---

[4] Kentucky Revised Statutes.

to a person twelve (12) years of age or less, or who is physically helpless or mentally helpless.

Smith argues that the trial court should have granted his motion for directed verdict on count two of the indictment because there was a "failure of the proof as to whether [K.R.] was in the actual custody of [Smith] at the time his head injury occurred[.]" Appellant's Brief at 9.

The legislature has not defined "actual custody." When statutory interpretation becomes necessary as part of appellate review, then a question of law arises, and our review is *de novo*. *Revenue Cabinet v. Hubbard*, 37 S.W.3d 717, 719 (Ky. 2000). When interpreting a statute, it is well established that we attempt "to discern the General Assembly's intent, and we derive that intent, if at all possible, from the language the General Assembly chose[.]" *Staples v. Commonwealth*, 454 S.W.3d 803, 816 (Ky. 2014) (internal quotation marks and citation omitted). The intent of the legislature is paramount and controls. Furthermore, the words should be afforded their ordinary meaning unless a contrary intent is apparent. *Old Lewis Hunter Distillery Co. v. Ky. Tax Comm'n*, 193 S.W.2d 464, 465 (Ky. 1945). After conducting a detailed analysis of statutory language and prior case law, this Court recently determined that "actual custody must necessarily include the direct care or the direct control of a child by a defendant." *Williams v. Commonwealth*, 706 S.W.3d 285, 289 (Ky. App. 2024) (citations omitted).

Rather than contesting the interpretation of the statute, however, Smith contests the sufficiency of the evidence against him. Smith asserts that "[t]he evidence on this question is circumstantial . . . ." Appellant's Brief at 9. Smith points to the portion of Dr. Currie's testimony wherein she says a skull fracture such as K.R. received could have been caused by a fall from a height and could have occurred up to two days before K.R. was hospitalized. Smith also casts suspicion on Ford who had cared for K.R. earlier in the day. Therefore, Smith claims it was "clearly unreasonable" for the jury to have found he had "actual custody" of K.R. at the time of his head injury.

Nevertheless, "[t]he jury is not required to accept the defendant's version of events at face value." *Barnes v. Commonwealth*, 91 S.W.3d 564, 570 (Ky. 2002). On the other hand, when considering a motion for directed verdict, "the trial court must assume that the evidence for the Commonwealth is true[.]" *Benham*, 816 S.W.2d at 187 (citation omitted). And, "[t]o defeat a directed verdict motion, the Commonwealth must only produce 'more than a mere scintilla of evidence.'" *Lackey v. Commonwealth*, 468 S.W.3d 348, 352 (Ky. 2015) (citations omitted). The Commonwealth more than satisfied that burden.

Though Dr. Currie testified that the head injury could have occurred within the two-day window before K.R. was admitted to the hospital, she also stated that the head injury would have been immediately apparent to a caregiver.

Smith denied K.R. had any injuries before he took the child into the bathroom. Both the child's mother and Ford observed K.R. before Smith took the child into the bathroom. Both women testified that K.R. appeared fine and witnessed no concerning behavior before Smith took the child into the bathroom. Smith admits he was alone in the bathroom with K.R. While K.R. was in the bathroom with Smith, Ford heard Smith become upset with the child. She heard a loud thud and the sounds of a spanking. She never heard the child cry. Smith admitted to becoming upset with K.R. and spanking the child before placing K.R. back into the bathtub which he had refilled with hot water. Smith admitted the child never screamed. In his various interviews and testimony, Smith described removing K.R. from the tub after K.R. "flipped back," shook as if having a seizure and became stiff and unresponsive.

"[T]he Commonwealth can prove all the elements of a crime by circumstantial evidence." *Commonwealth v. Goss*, 428 S.W.3d 619, 625 (Ky. 2014). Though Smith is correct that Ford and others may have cared for K.R. in the two days prior to his hospitalization, there is "more than a mere scintilla of evidence" that Smith had "actual custody" of the child at the time K.R. sustained the skull fracture. Nor was it "clearly unreasonable" for the jury to find Smith guilty. Therefore, the trial court did not err in denying Smith's motion for directed verdict.

2. *The trial court did not err in instructing the jury on criminal abuse in the first degree on count one of the indictment*.

Our Supreme Court has held that "[w]hen the [alleged] error arises from giving an unwarranted instruction or failing to give a warranted instruction, we review the decision for abuse of discretion" but if "the [alleged] error hinges on whether the text of the instruction accurately presented the applicable legal theory, we review the content of a jury instruction *de novo*." *Commonwealth v. Caudill*, 540 S.W.3d 364, 367 (Ky. 2018) (internal quotation marks and citations omitted). Smith claims the trial court erred in providing the jury with an instruction on first-degree criminal abuse regarding the immersion burns suffered by K.R. because the evidence failed to show Smith acted intentionally in subjecting him to water he knew was too hot for a child of K.R.'s age. Smith does not argue that the instruction misstates the law, but that the facts of the case did not support providing the jury with this instruction. Therefore, this Court "review[s] the trial court's decision to provide [the] jury instruction under an abuse of discretion standard[.]" *Downs v. Commonwealth*, 620 S.W.3d 604, 613 (Ky. 2020) (citations omitted). In particular:

> A decision to give or to decline to give a particular jury instruction inherently requires complete familiarity with the factual and evidentiary subtleties of the case that are best understood by the judge overseeing the trial from the bench in the courtroom. Because such decisions are necessarily based upon the evidence presented at the trial, the trial judge's superior view of that evidence warrants a

-11-

measure of deference from appellate courts that is reflected in the abuse of discretion standard.

*Id.* (quoting *Sargent v. Shaffer*, 467 S.W.3d 198, 203 (Ky. 2015), *overruled on other grounds by Univ. Med. Ctr., Inc. v. Shwab*, 628 S.W.3d 112 (Ky. 2021)).

At trial, Smith no longer claimed K.R. climbed into the hot water himself, and admitted he placed K.R. into the tub he had just refilled in order to "soak" the child before washing him. He also admitted K.R. was in the water for several minutes. Smith denied knowing the water was too hot and, in his brief, points once again to Dr. Currie's inability to say with certainty the exact temperature of the water or how long Smith kept K.R. immersed. Therefore, Smith claims "the circumstantial evidence was not of such probative value that the issue of intent could have been submitted to the jury."[5] Appellant's Brief at 15. We disagree.

"Hardly is the Commonwealth ever fortunate enough to present direct proof as to the thought process in a defendant's mind." *Commonwealth v. O'Conner*, 372 S.W.3d 855, 857 (Ky. 2012). "[C]ircumstantial evidence is enough to prove any element of a crime[.]" *Early v. Commonwealth*, 470 S.W.3d 729, 736 (Ky. 2015) (citation omitted). This includes intent. "Intent can be inferred from

---

[5] The trial court instructed the jury on all three degrees of criminal abuse and the associated *mens rea*: first-degree (intentional); second-degree (wanton); and third-degree (reckless). *See* KRS 508.100(1); KRS 508.110(1); and KRS 508.120(1).

the actions of an accused and the surrounding circumstances." *McCoy v. Commonwealth*, 553 S.W.3d 816, 822 (Ky. 2018) (internal quotation marks and citations omitted). More to the point:

> "Proof of intent . . . may be inferred from the character and extent of the victim's injuries. Intent may be inferred from actions because a person is presumed to intend the logical and probable consequences of his conduct and a person's state of mind may be inferred from actions preceding and following the charged offense."

*Ratliff v. Commonwealth*, 194 S.W.3d 258, 275 (Ky. 2006) (citations omitted).

As previously stated, KRS 508.100(1) requires a jury to find a defendant "intentionally abuse[d]" the victim. The jury was informed that "[]Abuse[] means the infliction of injury, sexual abuse, unreasonable confinement, intimidation, or punishment that results in physical pain or injury, including mental injury." R. at 135. This is the same definition provided in KRS 209.020(8). However, Smith wishes to conflate the intent to abuse with the intent to cause a *specific* injury, thereby seeking to impose a higher standard for conviction than that created by the legislature. The jury was not required to believe Smith intended to cause life-threatening second-degree burns to his two-year-old son in order to convict him of first-degree criminal abuse. The jury only needed to believe Smith intended to inflict injury upon the child by immersing him in hot water for several minutes or that Smith intentionally subjected the child to "unreasonable

-13-

confinement, intimidation, or punishment that result[ed] in physical pain or injury

. . . ." KRS 209.020(8).

The evidence was such that it was not unreasonable for the jury to infer intent from Smith's actions. "It is not required, in order to sustain a conviction based on circumstantial evidence, that the evidence be such as to exclude every possibility of the defendant['s] innocence; it is sufficient if all of the circumstances, when considered together, point unerringly to the defendant['s] guilt." *Holland v. Commonwealth*, 323 S.W.2d 411, 413 (Ky. 1959). Therefore, the trial court did not abuse its discretion when it included an instruction for first-degree criminal abuse relating to the immersion burns inflicted upon K.R. in count one of the indictment against Smith.

3. *The trial court did not err by denying Smith's motion to dismiss for undue pre-indictment delay*.

Though the injuries suffered by K.R. nearly proved fatal, over a year passed before Smith was presented for indictment and then only when new allegations of abuse occurred in 2019. Count Three of the indictment involving the 2019 incident was severed before trial on the two counts from 2017. Nevertheless, Smith claims the Commonwealth's pre-indictment delay violated his right to due process under the Fifth Amendment. We disagree.

"Kentucky law provides no statute of limitations for the prosecution of a felony offense." *Berry v. Commonwealth*, 84 S.W.3d 82, 85 (Ky. App. 2001)

-14-

(citations omitted). Therefore, Smith rightly acknowledges that this is not a speedy trial issue. Furthermore:

> Because the delay occurred prior to [the defendant's] indictment or arrest, the speedy trial provisions in the Sixth Amendment to the United States Constitution and Kentucky Constitution § 11 are not implicated. Nevertheless, unjustified and prejudicial preindictment delay may constitute a violation of due process and require dismissal.

*Id*. (internal quotation marks and citations omitted). To determine whether a violation has occurred, "a due process inquiry must consider both the reasons for the delay and the prejudice to the accused." *Id.* (citation omitted). "Prejudice alone will not suffice." *Id*. (internal quotation marks and citation omitted). "Dismissal of the indictment is required only where the accused shows substantial prejudice to the ability to present a defense and where the prosecutorial delay was intentional in order to gain a tactical advantage." *Id*. at 85-86 (citations omitted). The decision of the trial court is reviewed *de novo*. *See id*. at 87.

Smith argues that "[d]elay is always prejudicial and unnecessary delay naturally suspicious." Appellant's Brief at 18. He complains of "inconvenience" and asserts that the delay was "unjustifiable." *Id*. Smith also questions the sincerity of the Commonwealth in ascribing the delay to multiple personnel changes. None of this meets the criteria adopted by the Kentucky Supreme Court in *Berry*. Smith is unable to describe any prejudice, much less any *substantial*

-15-

prejudice, he encountered or any tactical advantage gained by the Commonwealth due to the delay. Smith invites this Court to presume that *any* delay results in a tactical advantage for the Commonwealth and prejudice to the defendant. We decline to accept that invitation. "[T]he mere passage of time does not give rise to a constitutional violation *per se*[.]" *Berry*, 84 S.W.3d at 87 (internal quotation marks and citation omitted). Therefore, as a matter of law, we find the trial court did not err in denying Smith's motion to dismiss the 2017 charges against him for due process violations caused by pre-indictment delay.

For the foregoing reasons, we AFFIRM the judgment of the Jefferson Circuit Court sentencing Smith to eighteen-years' imprisonment following his conviction for two counts of first-degree criminal abuse.

ALL CONCUR.

BRIEF FOR APPELLANT:

Michael C. Lemke
Louisville, Kentucky

BRIEF FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

Joseph A. Beckett
Assistant Attorney General
Frankfort, Kentucky